UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GLENROY MILLER,<br><br>    Defendant | No. 24-cr-10010<br>No. 24-cr-10021-1<br>No. 25-cr-10040-8 |

GOVERNMENT'S SENTENCING MEMORANDUM

From September 2019 to July 2021, Glenroy Miller was in state prison for various firearms offenses, and from prison, with the help of girlfriend, fellow inmates, and friends in the community—he stole about $134,000 from a local credit union by taking out fraudulent loans. He got out of prison and continued his life of crime—stealing mail to get checks to commit more bank fraud and selling guns, including a machinegun, and ammunition.

Miller will not be deterred by a prison term. His actions prove that he is a danger to the community whether in jail or in the community. This Court's goal should be to incapacitate him to protect the public and deter future crimes. The Court should sentence Miller to 78 months in prison to protect the public from him as much as feasible, bearing in mind that even when jailed, Miller has found ways to harm the community. Upon release, Miller should serve 36 months of supervised release. The Court should also order Miller to pay restitution of $158,689.80, with $134,000 of that amount joint and several with his co-defendant, Nadaje Hendrix. The govenrment further moves for a money judgment of $24,584, which is an amount directly traceable to the Defendant's offenses in the mail theft and check washing scheme.

## THE OFFENSE CONDUCT

In July 2016, the Boston Municipal Court sentenced Miller to 18 months in prison for violating state firearms laws, and in September 2019, the Suffolk Superior Court sentenced him to three years' imprisonment for violating state firearms laws again while he was on probation for the earlier Boston Municipal Court offense. (PSR ¶¶ 22, 83-84.)

In December 2019, while he was in jail, Miller's girlfriend, Nadaje Hendrix, who worked at a local credit union, took out a loan in his name based on a fraudulent loan application and had a co-conspirator sign the loan documents and get the money from her. (PSR ¶ 27.)

In June 2019, Hendrix and Miller resumed the scheme, and over the next two months, they used identifiers obtained from Miller's fellow inmates and from people in the community to take out fraudulent loans from the credit union where Hendrix worked. (PSR ¶¶ 28-34.) For each loan, Miller gave Hendrix the identifiers, and then, between the two, they recruited and instructed straw-signers, who went into the credit union and pretended to be an inmate or a person whose identity had been stolen. (*Id*.) For example, Miller explained the scheme to a co-conspirator on June 9, 2021. On June 19, 2021, on a joint call with Miller, Hendrix told a different co-conspirator when to meet her and what to do. (PSR ¶¶ 30, 33.) In total, Miller and Hendrix orchestrated 17 fraudulent loans, totaling $134,000. (PSR ¶ 37.) For each fraudulent loan, Miller and Hendrix obtained personal identifying information ("PII") from an inmate or unwitting third party and then directed the activity of straw-signers, of whom there were at least 16. (PSR ¶ 37.)

Starting in June 2023, Miller, with co-conspirators, perpetrated a new bank fraud. Miller's co-conspirators stole mail out of U.S. Postal Service collection boxes to get checks that had been mailed. (PSR ¶ 38). They focused on collection boxes in the richer suburbs west of Boston, because they believed that the checks would access accounts with higher balances. (*Id*.) Miller

and his co-conspirators then used an internet-based service that exploited data breaches to obtain the PII of the checks' payors. (PSR ¶ 39.) Using the PII, the co-conspirators would call banks, pretend to be account holders, and check account balances in order to decide which checks to exploit and deposit and in what amount. (*Id*.) The co-conspirators then chemically washed the checks to remove handwritten ink and re-wrote the checks to themselves or to accounts they controlled in amounts they thought would clear bank controls. (PSR ¶ 40.)

In furtherance of the scheme, on July 25, 2023, Miller deposited a fraudulent $9,507.30 check into the account of a co-conspirator. (PSR ¶ 43.) On July 26, 2023, Miller tried to conduct ATM transactions in another co-conspirator account that had received a fraudulent $4,202.01 check the day before. (PSR ¶ 44.) On August 21, 2023, Miller notified at least five co-conspirators that he had stolen checks. (PSR ¶ 45.) As discussed above, these conversations were commonplace in this scheme wherein co-conspirators discussed the availably of stolen checks, which were for sale, and identified valuable checks to exploit and deposit.

In total, Miller directly caused $24,584 in fraudulent check deposits, and based on information in Miller's phone, he discussed or possessed images of stolen checks totaling $227,677. (PSR ¶ 46.)

At about the same time he was defrauding banks using stolen checks, Miller also illegally sold six firearms, ammunition, and two machinegun conversion devices to an ATF cooperating witness. (PSR ¶ 13.) Many of these firearms came equipped with high-capacity magazines (PSR ¶¶ 15-16), meaning they were particularly dangerous weapons capable of mass destruction. Even more concerning, Miller sold a 9mm pistol equipped with an extended magazine and machinegun conversion device. A machinegun conversion device essentially converts a semi-automatic pistol

into an automatic weapon.[1] Fully automatic weapons are heavily regulated by the National Firearms Act and with good reason because they cause maximum damage in an extremely short burst of time. Fully automatic pistols are particularly dangerous because they lack the stability that automatic rifles offer due to their size, two-handed operation, and the stability of a rifle stock. Even the most experienced marksmen will indiscriminately spray bullets when operating a fully automatic pistol. Miller had no concern about who was receiving this type of dangerous weapon. He was merely interested in making fast money, no matter the harm this machinegun would do in Boston and beyond. In one of the transactions, the ATF cooperating witness informed Miller that he was a felon and unable to purchase these firearms for himself. (PSR ¶ 17.) In another transaction, the buyer asked Miller if a serial number had to be taken off of a firearm. (PSR ¶ 14.) Miller's response, "I don't even know," demonstrates his cavalier attitude towards gun dealing and the types of weapons he was trafficking onto the streets. At the end of the day, Miller had no concern and a complete disregard for the type of destruction and tragedy he was proliferating in his own community. This is particularly concerning given Miller's history with firearms, both as a possessor and a victim of gun violence.

## APPLICABLE SENTENCING GUIDELINES

In the Plea Agreement (ECF 79), the parties agreed that all the bank fraud counts charged in 24-cr-10021 and 25-cr-10040 constitute Group 1, under USSG § 3D1.2(d), and that the firearms offenses in 24-cr-10010 constitute Group 2.

---

[1] https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/ (last accessed July 30, 2025).

4

For Group 1, the parties agree on the "offense level" calculation, except for a two-point enhancement under USSG § 2B1.1(b)(4), for being in the business of receiving and selling stolen property. The government calculates the "offense level" for Group 1 as follows:

Miller's base "offense level" is 7, because he was convicted of bank fraud, which is referenced to USSG § 2B1.1 and has a statutory maximum sentence of 30 years (USSG § 2B1.1(a)(1)). His offense level is increased by 12, because he caused a loss of more than $250,000, but not more than $550,000 (USSG § 2B1.1(b)(1)(G)). His offense level is increased by 2, because there were more than 10 victims (USSG § 2B1.1(b)(2)) and by 2, because he was in the business of receiving and selling stolen property (USSG § 2B1.1(b)(4)).

Miller's "offense level" is also increased by four, because as to both bank fraud conspiracies, he was a leader, organizer, or manager and because the schemes were otherwise extensive (USSG § 3B1.1(a)). The defendant agreed in the Plea Agreement.

The PSR disagreed about the leadership enhancement as to Miller in the loan fraud scheme because Hendrix also received a four-point enhancement. (PSR at 41.) The PSR says that Hendrix was the real boss because she organized the defendant's conduct. (*Id*.) Hendrix did organize and direct criminal conduct, but so did Miller, for example, by recruiting straw-signers. (PSR ¶ 30.) And he was the boss. Hendrix asked for his "permission" to engage in the scheme. Hendrix had the idea, but Miller had control. The PSR contains an extended dialogue between the two that clearly shows that Miller was in charge. Hendrix asked Miller what his plan was for paying back the loans. He told her there was no plan. Miller told her that he never intended to have his straw-borrowers pay back the money, even though, as she complained, she would take the blame. And Miller told Hendrix that she had been foolish for not taking out loans for the maximum $10,000, that is, maximizing her risk. (PSR ¶ 35.) After that conversation, Hendrix did as Miller

5

commanded and only processed loans for $10,000. (PSR ¶ 36.) Hendrix also had to ask Miller for a share of the proceeds. He was in control of the distribution of the funds.[2] Bizarrely, the PSR concludes that, notwithstanding Miller's clear control of the scheme,[3] he was "more akin to an average participant." But the participants in this scheme were straw-signers, inmates who provided PII for loans, persons who stole identities in the community, and Hendrix and Miller. A scheme can have more than one leader and organizer. (PSR at 41.) This case proves the point: Hendrix was an organizer, but Miller was in charge.

The PSR also concludes that Miller was not a leader or organizer of the mail fraud scheme, even though, as the PSR concedes, Miller recruited others into the scheme, offered stolen checks for sale to his co-conspirators, and the scheme was otherwise extensive. (PSR at 42.) Nevertheless, the PSR concludes that no leadership enhancement applies because there were other organizers and recruiters. The PSR thus repeats its error as to Hendrix, failing to consider that "there can, of course, be more than one person who qualifies as a leader or organizer of a criminal association." USSG § 3B1.1, Note 4.

---

[2] The U.S. Probation Office is also aware of circumstances regarding the relationship between Hendrix and Miller that firmly establish that Miller was the dominant personality in the relationship. *See* Hendrix PSR (September 24, 2024) ¶ 50; *see also* Miller PSR ¶¶ 92 and 95. Hendrix also requested a restraining order against Miller on March 5, 2018, which expired on May 24, 2018.

[3] On May 16, 2025, the government provided U.S. Probation and the defendant with rough transcripts of jail calls between Hendrix and Miller. They conclusively show that although Hendrix had insider knowledge, Miller had control. On June 8, 2021, Hendrix proposed the scheme and then said, "I just wanted your permission." On June 12, 2021, Hendrix asked Miller what he would do with the loan proceeds, because she did not know. By that date, Miller had already asserted control and explained to Hendrix that he was bringing people into the scheme. On June 13, 2021, Miller told Hendrix she could not have a cut of a fraudulent loan. On July 14, 2021, Miller told Hendrix that she had to do more bad loans for him. On July 18, 2021, Miller told Hendrix to do another loan. On July 20, 2021, Miller told Hendrix to increase the amount of the loans, and she did. *See* Exhibit A, attached hereto.

Miller was also in the business of receiving and selling stolen property, namely stolen checks. Miller's own words justify this two-level enhancement. He informed his co-conspirators that "My man got grub," meaning that Miller had stolen checks available. The co-conspirators repeatedly referred to stolen checks as "grub" in their extensive communications about this scheme. Miller then asked his co-conspirators, "N****s wanna throw down," meaning who wants to purchase these stolen checks? Co-conspirators repeatedly offered stolen checks for sale to one another or advertised the sale of stolen checks on their social media accounts. Stolen checks were typically sold for $100 or more depending on the suspected account balance of the check payor. Stolen checks were re-sold because Miller and others in this conspiracy did not have access to enough bank accounts to exploit all of the checks that were stolen from the mail.

Accordingly, the "offense level" for Group 1 is 27.

As to Group 2, the parties and the PSR agree that the "offense level" is 24, pursuant to USSG §§ 2K2.1(a)(4)(B) and (b)(1). (PSR ¶¶ 54-60.)

The PSR correctly increases the defendant's "offense level" by 2, based on two units under USSG § 3D1.4(a). (PSR ¶¶ 69 and 71.)

Accordingly, Miller's combined offense level before acceptance of responsibility is 29 and with acceptance of responsibility under USSG § 3E1.1 is 26, with a Guideline Sentencing Range of 78-97 months.[4]

## SENTENCING ARGUMENT

The public needs to be protected from Miller. He has proven that he will not easily be deterred from crime and even orchestrated fraud scheme from inside a state prison. That fact

---

[4] The United States is bound by the Plea Agreement, which calculated an "offense level" of 24. The resulting Guideline Sentencing Range is 63-78 months.

shows that even with a jail sentence, Miller has found a way to victimize others. The Court should sentence Miller to 78 months in prison to send strong message to him that his persistence in criminal conduct will not be tolerated.

Miller grew up in difficult circumstances and has been the victim of violent crime. (PSR ¶¶ 100, 101, 106.) But his experience did not cause him to seek a way out. Instead, he dug in. By the time Miller committed the crimes of conviction, he had already been to prison for firearms offenses—twice. As noted, he committed the first bank fraud from jail. When he got out, he kept committing bank fraud with his girlfriend, until she was fired from the credit union where she worked, and then he turned to check fraud. And—undeterred from gun crime—he illegally sold multiple firearms, knowing full well what the consequences of his actions could be.

Miller's crimes are serious, and they justly merit significant punishment. His fraud crimes were craven. He used his girlfriend's desire for his approval to enrich himself, and he let her take the fall for their crimes. She was the one to lose a job, not him, and he took the lion's share of the proceeds. The victims of their crime was a community bank that trusted Hendrix and persons in the community who learned that they had loans in their name. (PSR ¶ 48.) The mail fraud scheme aimed to maximize harm to victims. Some of these victims were merely trying to pay bills, unaware that their payments were stolen until they came into arrears. This does not speak to the countless other pieces of mail, letters, or other correspondence that never reached their destinations because these co-conspirators stole vast quantities of mail and only kept the checks. Miller and his co-conspirators called banks to check balances using identities that they stole, all for the purpose of knowing what accounts to drain and which victims to exploit.

The defendant's gun crimes connect him to the economy of violence and intimidation that plagues neighborhoods in and around Boston. This defendant had every reason to want less

violence in Massachusetts. He had been shot himself and suffered through a recovery. But with that recovery, he did not step away. He got back to business. Miller has demonstrated the danger that he is to the community when he has access to firearms. When he was 19 years old he was arrested after a report that someone was pointing a firearm at people from Miller's car. The defendant was undeterred by this firearm conviction and jail sentence. When Miller was 22 years old, he was arrested with a firearm. During that arrest, Miller injured an officer while he was trying to reach for his firearm during the arrest, an incredibly dangerous scenario for the officers, Miller, and any bystanders in the area. Incredibly, no one was more seriously injured or killed during this arrest. Notably, this arrest occurred while Miller was wearing a court-ordered ankle monitor for his earlier firearm offense. The defendant was undeterred by his 3-year prison sentence for his second firearm conviction. He continued to surround himself with firearms, this time not merely possessing them, but also selling them to others who were otherwise unable to obtain firearms.

Even during his period of pretrial detention, Miller has been unwilling to abide by the rules of society.[5] Incredulously, the defendant used the jail's computer to look up inappropriate sexual material immediately following his presentence interview. (PSR ¶ 7.) The defendant has also been involved in several physical altercations while in pretrial detention. On March 6, 2024, Miller held the legs of an inmate while another inmate pummeled and stomped on the victim. Even when the pugilist directed Miller to stop, Miller continued assaulting the victim, resulting in everyone being pepper sprayed by correctional officers who were sent to disperse the fight. On April 25, 2024, Miller and his fighting companion again assaulted a different inmate in another two-on-one fight, this time leaving the victim bloodied. Miller has not demonstrated any remorse

---

[5] Though not all of these incidents are reported in the PSR, the govenrment can provide reports of these incidents from the jails, if necessary.

9

or desire to turn away from his life of crime. Quite the contrary, Miller appears to have entrenched himself in criminal behavior and associations, even while incarcerated.

It is difficult to imagine what sentence this Court could impose that would teach Miller to respect the law. That possibility is likely too much to be hoped. But the Court should consider that the sentence it imposes can promote respect for the law in the community. The public has a right to expect that the government and the Court will act to protect the innocent and to ensure that the defendant makes amends through restitution.

The sentence recommended by the government is just and would not represent an unwarranted disparity in sentencing. Sentencing data shows that at an "offense level" of 26, for a defendant in criminal history category III, sentenced under USSG § 2B1.1, the average and median sentences nationally are 66 and 70 months, respectively. Here, the government has recommended a top of the guideline sentence at an "offense level" of 24, based on the plea agreement. Any disparity with national data is fully warranted by the brazenness of the defendant's crimes and by his established recidivism.

Accordingly, the government asks the Court to sentence Miller to 78 months of incarceration and 36 months of supervised release. The Court should also order Miller to pay $158,689.80 in restitution, with $134,000 of that amount joint and several with Nadaje Hendrix. The government further moves for a money judgment in the amount of $24,584, which represents the amount Miller obtained through fraudulent bank deposits of stolen checks. (PSR ¶ 46.)

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   */s/ Philip C. Cheng*
Philip Cheng
Lucy Sun
Kriss Basil
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                          */s/ Philip C. Cheng*
                                          PHILIP C. CHENG
                                          Assistant United States Attorney